IN THE UNITED STATES DISTRICT COURT
FOR THE EASTERN DISTRICT OF TEXAS
SHERMAN DIVISION

| | | |
|---|---|---|
| MARTHA L. ESCOBAR, | § | |
| | § | |
| Plaintiff, | § | |
| | § | |
| v. | § | Case No. 4:05-CV-317 |
| | § | |
| THE UNIVERSITY OF NORTH TEXAS, | § | |
| | § | |
| Defendant. | § | |

**MEMORANDUM OPINION & ORDER GRANTING
DEFENDANT'S MOTION FOR SUMMARY JUDGMENT**

Before the court are "Defendant's Motion for Summary Judgment" (Motion) (docket entry #25), "Martha L. Escobar Molano [sic] Response to Defendant's Motion for Partial Summary Judgment and Brief in Support" (Response) (docket entry #31), and "Defendant's Reply to Plaintiff's Response to Defendant's Motion for Summary Judgment" (Reply) (docket entry #32). Upon consideration of the Motion, the Response, and the Reply, the court is of the opinion that the Defendant's Motion should be granted.

### BACKGROUND

Plaintiff Martha L. Escobar-Molano (Dr. Escobar) filed this action on August 9, 2005, after the University of North Texas (University) terminated her employment as a non-tenured assistant professor. *See* Pl.'s Original Compl. Dr. Escobar originally asserted claims against the University for sex, race and national origin discrimination under Title VII of the Civil Rights Act of 1964 and Chapter 21 of the Texas Labor Code and for age discrimination under the Age Discrimination in Employment Act (ADEA) and sought all "recoverable" damages under federal law including actual,

consequential, and exemplary damages. *Id*. ¶¶ 9-15. This court, however, dismissed Dr. Escobar's claims under the ADEA and Chapter 21 of the Texas Labor Code in an order dated October 27, 2005. The University then filed its motion for summary judgment, arguing that Dr. Escobar cannot present competent summary judgment evidence that the University intentionally discriminated against her under Title VII.

On August 25, 2003, Dr. Escobar began her employment with the University in a tenure track position, which is a probationary position in which professors attempt to secure tenure at the University. Motion, ¶ 1. As a tenure track professor, Dr. Escobar was to be reviewed annually during the probationary period, which could not exceed six years. *Id.* Upon being hired, Dr. Escobar was told her annual review would focus upon teaching, professional activity/service, and research. Escobar Dep. 134:8-135:22. Dr. Escobar also received a copy of the University's "Tenure and Promotion Policies" (Policy), which states that evaluation for tenure would focus on the "areas of teaching, professional activity, and service." Motion, Ex. A-2 ¶ 2. The Policy went on to state that a "key part of an established research program is the publication of research papers in refereed high-quality journals"[1] and that "quality teaching is the minimum expectation." *Id.* at ¶¶ 2.1-2.2. Additionally, the Policy stated that the candidates should seek external funding for their research and also seek membership in professional organizations. *Id.* at ¶ 2.2. A tenure track professor is evaluated each year in these areas in order to measure her progress toward achieving tenure. Mot. ¶ 2. The annual evaluations were conducted by the departmental Personnel Affairs Committee

---

[1] The Policy also states that papers in "quality conference proceedings, research monographs, books, and book chapters may be used in evaluating professional activity, but will be weighted lower than publications in refereed journals." Motion, Ex. A-2 ¶ 2.2. The Policy did not state a "hard-and-fast" rule as to an expected number of publications, but did state that evidence of "an established research program that has grown and matured with the professional development of the candidate" must exist. *Id.*

(PAC), which consisted of nine tenured professors. Motion, ¶ 3. Dr. Krishna Kavi (Dr. Kavi), the department chair, was not on the PAC but was responsible for hiring professors and making recommendations on a professor's renewal or termination. Motion, ¶ 4. Dr. Kavi held monthly mandatory faculty meetings and also offered non-tenured faculty an opportunity to meet with him for a monthly mentoring luncheon. *Id.* Dr. Escobar only attended two of these meetings. Motion, ¶¶ 4-5.[2]

A.   Dr. Escobar's Annual Tenure Track Evaluations

On January 29, 2004, Dr. Escobar received her first annual evaluation, which included reports that her teaching evaluations from Fall 2003 were "below departmental averages" and noted that she was "strongly encouraged to work on her research, publication, and proposal activities" and was "strongly advised to improve her performance in research and teaching." Motion, Ex. A-5. Despite this sub-par evaluation, the report did state that Dr. Escobar was "making satisfactory progress toward tenure." *Id.* At her second annual review, however, Dr. Kavi told Dr. Escobar that he did not believe she would make tenure and that he was going to recommend she be terminated. Escobar Dep. 80:1-5. Additionally, her performance reports again stated that her "performance in terms of teaching and research were below expectations." Motion, Ex. A-6. At that time, her teaching evaluations in undergraduate courses were still low, and she only had one publication in conference proceedings and two papers submitted for publication. *Id.* Further, Dr. Escobar made no efforts to obtain external funding for research in the twelve-month period before her evaluation.

---

[2] The University contends that Dr. Kavi told the non-tenured faculty at these meetings that they should be averaging three publications per year. Dr. Escobar contests this point. The court will resolve this conflict in evidence in favor of Dr. Escobar, as the non-movant. *See Anderson*, 477 U.S. at 255. Even assuming Dr. Escobar was not told at these meetings to publish three articles per year, the Policy clearly states that the University places an emphasis on publications and scholarly work.

*Id.* Given her poor performance and Dr. Kavi's inclination to recommend her for termination, Dr. Escobar agreed to submit to Dr. Kavi her goals for the next academic year in an attempt to show how she planned to get on the right path toward tenure.[3] *Id.* Motion, ¶ 6. The goals submitted by Dr. Escobar did not meet Dr. Kavi's expectations, and he therefore recommended to Dean Oscar Garcia (Dean Garcia) that Dr. Escobar be terminated. Motion, ¶ 6.

Dr. Escobar claims that Dr. Kavi never fully informed her of his expectations for her goals and that if he had done so, she would have submitted adequate goals. Escobar Aff. ¶ 5. She further claims that she did not have a chance to correct or supplement her goals because she was terminated so quickly after receiving notification that her goals were inadequate. Response, ¶ 8. Upon receiving Dr. Kavi's recommendation for termination of Dr. Escobar, Dean Garcia requested the opinion of the college's PAC, which was comprised of the department heads of the college. They also recommended Dr. Escobar be terminated. Motion, ¶ 7. Dr. Escobar was notified of her termination on December 10, 2004, approximately 18 days after being told her goals were insufficient. *Id.* Motion, Ex. A-13.

Interestingly, it appears as though the discussion over Dr. Escobar's tenure did not end with her termination. An email exchange from spring 2005 demonstrates that Dr. Kavi offered to meet with Dr. Escobar, without her lawyers, to offer advice on what she would need to do in the future to stay on staff and make progress toward tenure, despite her termination. Motion, Ex. A-13. The meeting did occur, but it was cut short by Dr. Kavi because he did not feel Dr. Escobar was present to receive advice, but rather that she wanted to rehash her earlier review process. *Id.*

---

[3] The departmental PAC recommended Dr. Escobar for renewal, but this recommendation was based upon an adequate submission of goals to Dr. Kavi.

B.     Other Professors' Annual Tenure Track Evaluations

Dr. Escobar argues that there were several professors similarly situated to her but who were not terminated. However, only one, Dr. Ram Dantu (Dr. Dantu), was from her professor "class." Dr. Escobar primarily argues that professors one year ahead of her, including Dr. Robert Akl (Dr. Akl), Dr. Carl Steiner (Dr. Steiner), and Dr. Phillip Sweany (Dr. Sweany), were similarly situated yet treated more fairly than her. Motion, ¶¶ 8-9. Response, ¶¶ 8-13. Dr. Akl's teaching evaluations were "well above departmental average," and while in his first year he was encouraged to work on his publication record, by his second year he had three publications under review, was successful in getting small amounts of funding, had applied for five external grants, and was found to be making "very good" progress toward tenure. Motion, Ex. A-10.[4] Dr. Steiner's teaching reviews were "outstanding," and by his second year, he had published one refereed conference paper, had a paper accepted for publication as a book chapter, had submitted two proposals and had received research funding. Motion, Ex. A-11. Dr. Sweany's teaching evaluations were "generally positive" and "decent but not spectacular;" however, he did attend teaching workshops. Response, Ex. 15. His publication activity was "good" his first year and by his second year his number of submissions was "acceptable," though the PAC advised him to improve his publication rate. *Id.* Both years Dr. Sweany's progress toward tenure was noted as "good."

The only professor in Dr. Escobar's "class" who was a candidate for tenure and with whom she compared herself was Dr. Dantu. Dr. Dantu's teaching reviews for graduate level courses were positive, but, similar to Dr. Escobar, his undergraduate course reviews for his first two years were

---

[4] The University also submitted his evaluations for the third year of teaching, but the court will not review them as Dr. Escobar only stayed two years at the University.

poor. Response, Ex. 14. Unlike Dr. Escobar, though, Dr. Dantu's publication record was noted as "solid" his first year as he had three conference papers, had several presentations and had applied for funding from both external and internal sources. Additionally, by his first year evaluation he had set up a research lab and "attracted graduate students." *Id.* In his second year, the PAC noted that Dr. Dantu had been "quite productive in research" and that he had several papers in preparation for submission. *Id.* Overall, in year one his progress toward tenure was "acceptable" and in year two it was "good." *Id.*

One professor, who was in Dr. Escobar's "class" and was not mentioned by Dr. Escobar, was Dr. David Barrett (Dr. Barrett).[5] In his reviews, Dr. Barrett received good teaching evaluations at the graduate level, but failed to teach any undergraduate courses. Motion, Ex. A-9. By his second year, Dr. Barrett had submitted three papers for publication, none of which had been accepted, and the PAC advised him that without "substantial improvement" in his performance they could not recommend him for renewal at his next evaluation. *Id.* The same statement was made to Dr. Escobar on her second year evaluation. Motion, Ex. A-6. Both professors were terminated, however, before their third year evaluations. Motion, ¶ 8.

C.      Dr. Escobar's Claims of Discrimination

Dr. Escobar states in her Response that she is a Hispanic (Colombian) female and that when she applied and was hired for her position, there were no other Hispanic female professors in the Department of Computer Science and Engineering. *Id.* at ¶¶ 2-3. Further, Dr. Escobar claims that she attempted to get specific advice from Dr. Kavi on how to improve over the course of her employment, but that she was told only to apply for a government grant with two other females

---

[5] Dr. Barrett is also Dr. Escobar's husband.

because "three gals are better than two."[6]

Dr. Escobar makes several statements in support of her argument that she was terminated due to discrimination as opposed to performance, but in support of these claims she offers the court only her subjective belief of discrimination. For instance, she states that she was given the "cold shoulder," that her teaching ability was "as good as, if not better than" Drs. Steiner and Sweany's teaching abilities and that her publication record was much better than Drs. Akl, Steiner and Dantu.[7] She does not, however, have any support for these statements. Her only other evidence is anecdotal evidence: repeated references to the lack of female and Hispanic professors in the Department of Computer Science and Engineering.

## LEGAL STANDARD

The purpose of summary judgment is to isolate and dispose of factually insufficient claims or defenses. *See Celotex Corp. v. Catrett*, 477 U.S. 317, 327 (1986). Summary judgment is proper if "the pleadings, depositions, answers to interrogatories, and admissions on file, together with the affidavits, if any, show that there is no genuine issue as to any material fact and that the moving party is entitled to a judgment as a matter of law." FED. R. CIV. P. 56(c). A dispute about a material fact is genuine "if the evidence is such that a reasonable jury could return a verdict for the nonmoving party." *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 248 (1986). The substantive law identifies which facts are material. *See id.* The party moving for summary judgment has the burden to show

---

[6] There is some discrepancy as to whether she contends Dr. Kavi or Dean Garcia made this comment to Dr. Escobar. In her Response, she claims it was Dr. Kavi, but in her deposition she claimed it was Dean Garcia.

[7] Dr. Escobar provided the court with a record of her publications; however, after reviewing the record the court concludes that it is a list of her publications and grants inclusive of her time prior to joining the University. As the only relevant time period for tenure, and for comparison with the other candidates, is after she joined the University, the court will consider only any publications made during that time.

that there is no genuine issue of fact and that it is entitled to judgment as a matter of law. *See id.* at 256. If the movant bears the burden of proof on a claim or defense on which it is moving for summary judgment, it must come forward with evidence that establishes "beyond peradventure *all* of the essential elements of the claim or defense." *Fontenot v. Upjohn Co.*, 780 F.2d 1190, 1194 (5th Cir. 1986). Once the movant has carried its burden, the nonmovant "must set forth specific facts showing that there is a genuine issue for trial." FED. R. CIV. P. 56(e). The nonmovant must adduce affirmative evidence. *See Anderson*, 477 U.S. at 257.

In considering a motion for summary judgment, the court cannot make credibility determinations, weigh evidence, or draw inferences for the movant. *See Anderson*, 477 U.S. at 255. The evidence of the nonmovant is to be believed, and all justifiable inferences are to be drawn in the nonmovant's favor. *See id.*

### DISCUSSION AND ANALYSIS

The framework for determining whether discrimination under Title VII exists is well settled: the Fifth Circuit utilizes the *McDonnell Douglas* burden shifting test. *Okoye v. The Univ. of Tex. Houston Health Science Ctr.*, 245 F.3d 507, 512 (5th Cir. 2001). Under this test, the plaintiff must first establish a prima facie case of discrimination. *Id.* If the plaintiff meets her burden, the defendant must then produce a legitimate, nondiscriminatory reason for termination. *Id.* If the defendant is able to meet this burden, which is one of only production and not persuasion, then the presumption of discrimination vanishes. At this point the plaintiff must ultimately prove that the legitimate reasons offered by the defendant were not its true reasons but rather were merely a pretext for discrimination. *Id.* In making this evaluation, the court may not scrutinize the employer's judgment as to whether a candidate is qualified. *Deines v. Tex. Dep't of Protective & Regulatory*

*Servs.*, 164 F.3d 277, 281 (5th Cir. 1999). Rather, the court's only question is whether the employer's decision as to a particular candidate was motivated by discrimination. *Id. Little v. Republic Refining Co.*, 924 F.2d 93, 97 (5th Cir. 1991)

The evidence a plaintiff brings forward to demonstrate the presence of a fact issue must be more than statistical evidence involving the number of other race or other gender employees who work for the employer. *See Keelan v. Majesco Software, Inc.*, 407 F.3d 332, 345 (5th Cir. 2005). Further, the plaintiff must provide the court with more than her own subjective belief she was discriminated against. *See Little*, 924 F.2d at 96 ("An age discrimination plaintiff's own good faith belief that his age motivated his employer's action is of little value."). Finally, in order for comments in the workplace to be sufficient evidence of discrimination, they must be "(1) related [to the protected class of persons of which the plaintiff is a member]; (2) proximate in time to the terminations; (3) made by an individual with authority over the employment decision at issue; and (4) related to the employment at issue." *Krystek v. Univ. of S. Miss.*, 164 F.3d 251, 256 (5th Cir. 1999) (quoting *Brown v. CSC Logic, Inc.*, 82 F.3d 651, 655 (5th Cir. 1996)). Comments will not create a fact issue if they are merely stray remarks, which were not made in connection with the employment action. *See Keelan*, 407 F.3d at 346.

A.     Dr. Escobar's Prima Facie Case

The prima facie case for discrimination may be established by providing evidence that the plaintiff: (1) is a member of a protected class; (2) was qualified for her position; (3) was subject to an adverse employment action; and (4) was treated less favorably than others who were similarly situated. *Okoye*, 245 F.3d at 512-13. In the instant case, for the purpose of its motion, the first three prongs are uncontested by the University. The University claims, however, that Dr. Escobar cannot

meet her burden on the fourth prong. To establish this fourth prong, Dr. Escobar must show that non-Hispanic or male employees were treated differently under circumstances "nearly identical" to hers. *See Keelan*, 407 F.3d at 345. Merely referencing a lack of other Hispanic or female professors can neither show nor be reasonably inferred to show better actual treatment of male, non-Hispanic professors in "nearly identical" circumstances. *See id.*

Dr. Escobar has not met her prima facie burden; she is unable to show that she was treated less favorably than others who were similarly situated. First, none of the professors that Dr. Escobar identified were in "nearly identical" circumstances. A majority of them were not even in her "class." Second, if this "class" difference alone does not keep them from being "nearly identical," then their reviews, like those of Dr. Dantu, are sufficient to keep them from being "nearly identical." The professors who were a year ahead of Dr. Escobar each had better teaching evaluations than Dr. Escobar's, ranging from "well above departmental average" to "decent but not spectacular." Even if the latter comment is not extremely high praise, it is much better than the reviews Dr. Escobar received.[8] Also, each of these professors had several papers published or submitted and were all making "very good," "good," or "acceptable" progress toward tenure. With regard to Dr. Dantu, while he struggled in his teaching evaluations for undergraduate courses, his publication record was "solid" and his progress toward tenure was "acceptable" his first year and by his second year had been upgraded to "good."

Dr. Escobar, on the other hand, never had good teaching reviews, was told her publication record was poor, and was told her progress toward tenure was "satisfactory" her first year and by her

---

[8] Additionally, the professor who received that comment began attending teaching workshops in an attempt to improve his teaching skills.

second year, she was warned that without improvement she would be terminated. None of the professors with whom Dr. Escobar has compared herself are "similarly situated" to her. The only professor with similar remarks on his evaluation is Dr. Barrett, who was terminated during the same probationary year as Dr. Escobar. Therefore, the court concludes that Dr. Escobar has failed to present a genuine issue of material fact on the fourth prong of her prima facie case.

B.   The University's Legitimate, Nondiscriminatory Reasons and Dr. Escobar's Response

Even if her evidence could be considered enough to support a prima facie case, Dr. Escobar is still unable to prove that a genuine issue of material fact exists as to her discrimination claim.[9] The University offered legitimate, nondiscriminatory reasons for terminating Dr. Escobar, which the record reflects: her poor teaching evaluations and her poor publication record and further, her failure to respond to admonitions about both. Thus, the presumption of discrimination disappears, and Dr. Escobar must prove the proffered reasons were pretextual.

Dr. Escobar's anecdotal evidence, subjective belief, and one stray remark are insufficient to create a fact issue on whether the University had any discriminatory intent in terminating her. Further, her comparison to other professors who were not similarly situated to her does not support her contentions either. The only professor with remarks on his evaluation that were "nearly identical" to those on Dr. Escobar's evaluations was also terminated. Her subjective belief, which is found in her affidavit, that she was better qualified than the professors who were not terminated, and the comment that "three gals are better than two" she claims was made by Dr. Kavi or Dean Garcia are also insufficient to meet Dr. Escobar's burden. First, Dr. Escobar offers no other

---

[9] Without explicitly stating so, it appears as though the Fifth Circuit is reluctant to reject a discrimination claim by the "similarly situated" fourth prong standard at the prima facie stage of the analysis. *See Okoye*, 245 F.3d at 513.

witnesses who can attest to her being better qualified than the other professors, and her subjective belief alone will not act to create a fact question on this issue. Second, the complained-of comment was made approximately six months before Dr. Escobar's termination and was made in reference to ways in which Dr. Escobar might be able to obtain outside funding for her research. Escobar Dep. 92:8-93:23. Because this comment was not made close in time to Dr. Escobar's termination and was not made in connection with her termination, it constitutes nothing more than a stray remark. *See Keelan*, 407 F.3d at 346.

Therefore, this court finds that regardless of whether it determines that Dr. Escobar failed to establish her prima facie case or whether it pursues the entire *McDonnell Douglas* analysis, Dr. Escobar has not created a fact issue from which a jury could reasonable infer that national origin or gender was a determinative factor in her termination. *See Grimes v. Tex. Dep't Mental Health & Retardation*, 102 F.3d 137, 141 (5th Cir. 1996) (holding that a plaintiff can avoid summary judgment if the evidence, taken as a whole: "(1) creates a fact issue as to whether each of the employer's stated reasons was not what actually motivated the employer and (2) creates a reasonable inference that [a protected trait] was a determinative factor in the actions of which plaintiff complains"). Therefore, the Defendant's motion for summary judgment should be granted.

## Conclusion

For the reasons stated, the court concludes that no genuine issue of material fact as to whether the University discriminated against Dr. Escobar exists. Therefore, the court hereby **GRANTS** the "Defendant's Motion for Summary Judgment" (docket entry #25). All motions that remain pending are denied as moot.

**SIGNED this the 13th day of March, 2007.**

_____
RICHARD A. SCHELL
UNITED STATES DISTRICT JUDGE